UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

DAOUD IBRAHEEM,

                Plaintiff,

            v.

WACKENHUT SERVICES, INC., JAMES
CARBANARO, HOWARD CHAMBERLAIN,
WILLIAM McLAUGHLIN, JEAN-ARNOLD PAULINE,
and RENATO VELATI,

                Defendants.

-------------------------------------------------------------------x

**MEMORANDUM & ORDER**
09-CV-5335 (PKC)

PAMELA K. CHEN, United States District Judge:

      Before the Court is the motion for summary judgment pursuant to Federal Rule of Civil Procedure ("FRCP") 56 of Defendant Wackenhut Services, Inc. ("Wackenhut") and five individual defendants, who are current or former Wackenhut employees ("Individual Defendants"). Plaintiff Daoud Ibraheem, a former employee of Wackenhut, asserts claims for: (1) employment discrimination based on his age, race, and religion under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law ("NYSHRL") § 296; (2) hostile work environment; (3) retaliation; (4) intentional infliction of emotional distress, (5) negligent infliction of emotional distress, (6) defamation, and (7) breach of contract.[1] (Dkt. 8 at 2–7.) Because there remain genuine disputes of material fact with respect to Plaintiff's employment discrimination and hostile work environment claims based on religion, as well as

---

[1] Plaintiff has withdrawn his claim for breach of contract, and it is accordingly dismissed. (Dkt. 105-1 at 31.)

his retaliation claim, Defendants' motion is denied as to those claims. All of Plaintiff's other claims, including his discrimination claims based on age and race, are dismissed either as non-justiciable or insufficient as a matter of law.

*BACKGROUND*

I.  <u>Plaintiff's Statement Pursuant to Rule 56.1</u>

As an initial matter, Defendants urge the Court to disregard Plaintiff's counterstatement pursuant to Local Civil Rule 56.1 ("Rule 56.1") for failing to comply with the rule. (Dkt. 102 at 2.) Rule 56.1 requires that the facts relied upon in the party's briefs be set forth in a separate, concise statement. Rule 56.1(a). Indeed, Plaintiff's Rule 56.1 counterstatement ("Pl. St.") does not comply with Rule 56.1 because it fails to adequately set forth the facts upon which Plaintiff relies in his opposition to the motion, and largely contains legal conclusions, not statements of fact with citations to evidence supporting his contentions. (*See* Dkt. 105.)[2]

Generally, a party's failure to respond to the facts set forth in the moving party's Rule 56.1 Statement constitutes an admission of those facts. *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003) (citations omitted). However, the Court has ample discretion to excuse a party's failure to comply with local rules. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted). Here, the Court finds good cause to excuse Plaintiff's failure to comply with Rule 56.1, and does not deem admitted all of the facts set forth in

---

[2] "[A]llegations of uncontested fact cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement." *Holtz*, 258 F.3d at 73; *see also Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[T]he district court may not rely solely on the statement of undisputed facts contained in [a] 56.1 statement . . . [and] must be satisfied that the citation to evidence in the record supports the assertion."). "[W]here there are no[ ] citations or where the cited materials do not support the factual assertions in the [56.1] Statements, the Court is free to disregard the assertion," *Holtz*, 258 F.3d at 73–4 (quotations and citations omitted), and review the record independently. *Id.* at 74.

Defendants' 56.1 Statement ("Def. St.").  Plaintiff has conducted substantial discovery and has included numerous exhibits in his opposition Defendants' motion.  Accordingly, the Court will deem admitted only those facts set forth in Defendants' 56.1 Statement that are not countered by admissible evidence in the record that is properly cited to by Plaintiff.  *See Monahan v. N.Y City Dep't of Corrections*, 213 F.3d 275, 292 (2d Cir. 2000) ("While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.") (quotations and citations omitted); *Amnesty Amer. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute").

As a consequence, most of the facts set forth immediately below and relied upon by the Court are taken from Defendants' 56.1 Statement.

II.    Factual Background

A.    Plaintiff's Employment by Wackenhut

Wackenhut is a private company that supplies security personnel to government customers, such as the Federal Protective Service ("FPS"), for which Wackenhut provides security services in the New York area.  (Def. St. ¶¶ 1–4.)[3]  The Individual Defendants are five present or former Wackenhut employees: James Carbonaro, Renato Velati, Howard Chamberlain, Jean-Arnold Pauline, and William McLaughlin, all of whom either supervised or worked directly with Plaintiff.  (Def. St. ¶¶ 24–30.)  Carbonaro is the Project Manager; Velati is the Integrity Control Officer; Chamberlain is a former Lieutenant security officer; Pauline also is

---

[3] FPS and the individual FPS officers were dismissed as defendants by order of the Honorable Sandra L. Townes, to whom this matter was previously assigned.  (*See* Dkt. 62.)

a former Lieutenant security officer; and McLaughlin is a former Sergeant security officer. (Def. St. 24–30.)[4]

At all times relevant to the complaint and the present motion, Plaintiff was a security officer at the federal facility known as 26 Federal Plaza, in New York City. (Def. St. ¶ 49.) Plaintiff is a black male of the Muslim religion, born on March 6, 1937. (Def. St. ¶¶ 32–34.) Wackenhut hired Plaintiff as an armed security officer on November 1, 2007, when Plaintiff was 70 years old. (Def. St. ¶¶ 49–51.) Wackenhut hired Plaintiff knowing that that he was a Muslim who wore a beard for religious reasons. (Def. St. ¶¶ 49–51; Dkt. 103 ¶ 8.) Plaintiff was assigned to 26 Federal Plaza in New York City, primarily at the entrance to the Court of International Trade ("CIT") in Manhattan. (Def. St. ¶¶ 31–34.)

B.    Defendants' Allegedly Discriminatory Treatment of Plaintiff

1.    Plaintiff's Proof-of-Religion Letter

The parties do not dispute much with respect to the events surrounding the "proof-of-religion" letter attesting to Plaintiff's status as a Muslim. Rather, the primary disagreement regards what inferences can be drawn from those facts.

Wackenhut maintains a policy that all security personnel must be clean shaven, except for sideburns and mustaches, with exceptions afforded to security personnel who wear a beard for religious reasons. (Def. St. ¶¶ 59–60.) Personnel who seek to claim this exception must set forth in writing that they wear a beard for religious purposes. Plaintiff submitted such a letter to Wackenhut, which Wackenhut maintained in its office during his employment. (Def. St. ¶¶ 61–62.)

---

[4] Isom, Wackenhut's General Manager, who ultimately made the decision to terminate Plaintiff, is not a defendant in this action, but appears in the discussion below.

For two years after Plaintiff submitted the letter affirming his religious status, Plaintiff was not asked about his beard or asked to prove his religious status. (Def. St. ¶¶ 61–62.) According to Carbonaro's deposition testimony, asking a security guard to have the letter in his possession while working was not the regular policy or practice at Wackenhut, especially because Wackenhut kept Plaintiff's letter in its offices. (Dkt. 105-9 at 74–76.) Yet, on June 19, 2009, Chamberlain informed Plaintiff that Officer Gary Sandrowsky of the FPS felt that Plaintiff should keep a copy of his proof-of-religion letter on his person while at work, and Chamberlain ordered Plaintiff to carry the letter. (Def. St. ¶¶ 63–67; Dkt. 105-3 at 68; Dkt. 105-4 at 111.) Over the course of the following week, Plaintiff was asked multiple times by supervisors to produce the letter. (Def. St. ¶¶ 70–74.) First, Chamberlain asked whether Plaintiff had the letter. (Dkt. 105-3 at 77.) When Plaintiff said that he did not have the letter with him, Chamberlain said nothing else and walked away. (Def. St. ¶¶ 70–71; Dkt. 100-3 at 77.) The second time Plaintiff was asked for the letter, Defendant McLaughlin made the request. When Plaintiff stated that he did not have the letter, McLaughlin asked when he would have it, to which Plaintiff responded that he would have the letter the following Monday. McLaughlin said nothing further and walked away. (Dkt. 100-3 at 78.) Plaintiff next was asked by FPS Officer Jose Alvarez whether he had the letter. (Dkt. 100-3 at 78.) Although Plaintiff actually had the letter on him that time, he misrepresented to Alvarez that he did not have it. Alvarez gave no response and walked away. (Dkt. 100-3 at 79–80.) Lastly, Chamberlain again asked Plaintiff whether he possessed the letter. When Plaintiff told Chamberlain that he had the letter, Chamberlain responded, "Well, I'm glad that's over[.]" (Dkt. 100-3 at 81.) No one again asked Plaintiff

about the letter. (Dkt. 100-3 at 81.)[5] The last time Plaintiff was asked about the letter was approximately June 25, 2009. (Dkt. 105-4 at 81.)

### 2. Plaintiff's Suspension for Inattentiveness to Duty

Approximately two months after being asked about the proof-of-religion letter, on August 25, 2009, FPS Officer Alvarez reported to Wackenhut that he and FPS Officer Gary Sandrowsky had observed Plaintiff asleep on duty. (Def. St. ¶ 81.) Sleeping while on duty is a terminable offense under Wackenhut's "disciplinary matrix," which prescribes certain penalties for various workplace infractions. (Def. St. ¶¶ 11, 83.) Based on the report that Plaintiff was asleep, Carbonaro recommended that Plaintiff be terminated, as prescribed by the disciplinary matrix. (Def. St. ¶ 83.) Plaintiff denied that he was asleep on the job and demanded that videotape evidence be produced to prove that he had not been asleep. (Def. St. ¶ 86; Dkt. 105-9 at 12–13.) No videotape was ever produced to Plaintiff, nor did Wackenhut ever obtain or review any videotape regarding the alleged sleeping incident. (Dkt. 105-9 at 18–19.)[6] Because Plaintiff denied that he was asleep, Isom, Wackenhut's General Manger, reduced Plaintiff's punishment to a two-day suspension for being inattentive to duty, per the disciplinary matrix. (Def. St. ¶ 87; Dkt. 100-8 at 5.)

---

[5] The record is not clear as to how many times Plaintiff was asked about the letter. Plaintiff testified that he was asked five or six times, but only recounted four specific incidents. (Dkt. 105-4 at 77–79.) After recounting the four incidents, Plaintiff testified that "McLaughlin asked me twice," but did not elaborate on the second occasion. (Dkt. 105-4 at 79.)

[6] At oral argument on this motion, held on March 31, 2014, the parties confirmed that neither party has ever obtained or viewed videotape of the alleged sleeping incident, which was in the possession of the FPS.

### 3. Limited Access to Heated Booth

Plaintiff alleges in his complaint that other employees were permitted to warm themselves in a heated booth while on duty, but that Plaintiff was prohibited from doing so. (Dkt. 8 ¶ 22.)  During his deposition, Plaintiff testified that he was only allowed access to the heated booth for ten minutes every hour, whereas other security officers were permitted unlimited access to the heated booth.  (Def. St. ¶¶ 95–95; Dkt. 105-5 at 147.)  Plaintiff claims that he was the only guard given a time limitation for the heating booth.  (Dkt. 105-5 at 147.)

### 4. Standing Post Requirement

Following the sleeping incident, the CIT post to which Plaintiff usually was assigned was designated a "standing post," at which no chair was to be used by the on-duty security personnel. (Def. St. ¶ 98.)  Nevertheless, Plaintiff sometimes would use a chair and sit at his post.  (Def. St. ¶ 100.)  Although Plaintiff alleges that the change at the CIT post was implemented to prevent him from sleeping on the job (Dkt. 8 ¶ 23), the standing requirement was applied to all security personnel assigned to that post, not just Plaintiff.   (Def. St. ¶ 101; Dkt. 105-5 at 153.) Approximately one week after the sleeping incident, many other posts in addition to Plaintiff's CIT post were at least temporarily changed to standing posts as well.  (Dkt. 105-5 at 163.)

### 5. Failure to Pay Plaintiff for Training Day

Plaintiff alleges that, in October 2009, he was not paid for one day's work during which Wackenhut employees were trained.   (Dkt. 8 ¶ 26.)   As Plaintiff acknowledges, however, Wackenhut did not pay any employees for that day of training.   (Def. St. ¶¶ 103–105.)[7]

---

[7] When asked in his deposition about any facts supporting the contention that he was not paid because of his race, religion or age, or in retaliation, Plaintiff stated, 'I can't say that, because everybody didn't get paid." (Def. St. ¶ 105.)

Although Plaintiff speculates that others were eventually compensated for the training day, he has submitted no evidence to support that conclusion. (Dkt. 105-5 at 159.)

### 6. Failure to Carry Out Assigned Task

On February 8, 2010, Plaintiff received a written reprimand for failing to carry out an assigned task, as prescribed by the disciplinary matrix. (Def. St. ¶¶ 106–13.) Plaintiff was charged with failing to perform the task of completing the "Officer's Operations Log" as required by Wackenhut and FPS policy. (Def. St. ¶ 106.) Although Plaintiff routinely completed the Officer's Operations Log as required, on February 8, 2010, he failed to do so, and received a written disciplinary report. (Def. St. ¶¶ 107–110.)

### 7. Abandoning One's Post

On April 1, 2010, Plaintiff twice was found to be away from his post. (Def. St. ¶ 123.) Absence from one's post without being properly relieved is a terminable offense according to Wackenhut policies and the disciplinary matrix. (Def. St. ¶ 121.) Plaintiff first left his post that day for seven minutes to retrieve his coat from his locker. Plaintiff did not receive permission to leave his post and was not relieved by another security guard. (Def. St. ¶¶ 124–26.) Plaintiff acknowledges that he was away from his post without obtaining relief or supervisory approval. (Def. St. ¶ 125.) Plaintiff was reprimanded and received a disciplinary report for being away from post. (Def. St. ¶¶ 127–28.) Velati recommended that Ibraheem be suspended for five days, with which Carbonaro concurred. (Def. St. ¶¶ 128–30.)

Later that same day, Plaintiff was away from his post for 26 minutes. (Def. St. ¶ 123.) Plaintiff claims he left his post the second time because he was told by another security guard, Victor Rivera, that a supervisor, Ethelbert Charles, had ordered Plaintiff to leave his post and relieve Rivera from his post so that Rivera could take a restroom break. (Def. St. ¶ 131.)

Plaintiff did not speak directly to Charles, but relied on what Rivera told him about Charles's directive to relieve Rivera. (Def. St. ¶¶ 131–33, 146; Dkt. 100-2 at 53–54.)

Plaintiff contends that he was set up by Charles to create a pretextual reason to fire Plaintiff. Plaintiff alleges that Charles lied about directing Rivera to tell Plaintiff to leave his post to relieve Rivera in order to avoid being disciplined for improperly allowing Rivera to leave his post. (Def. St. ¶ 137.) Indeed, the prior statements and deposition testimony of Rivera and Charles directly conflict: Charles denies giving the order; Rivera claims that he did. (Def. St. ¶ 134; Pl. St. ¶ 136; Dkt. 105-11 at 22; Dkt. 105-10 at 16–17.)

### 8. Plaintiff's Termination and Alleged Retaliation by Defendants

On April 1, 2010, Plaintiff was terminated for violating the conditions of his employment, including sleeping while on duty and being away from his post twice on the day he was terminated. (Def. St. ¶ 146; Dkt. 99 at 15–18; Dkt. 100-3 at 131–140.) Plaintiff initiated this action on December 7, 2009, prior to his termination. (Dkt. 1.) Plaintiff's original complaint alleged that he was harassed and discriminated against at work on the basis of religion and race. (Dkt. 1 at 2.) Because Plaintiff had not yet been terminated, Plaintiff's initial complaint did not allege retaliation or wrongful termination. Approximately ten days after his termination, on April 12, 2010, Plaintiff submitted an amended complaint, which added claims relating to his termination and alleged retaliation. (Dkt. 8.)

On or about January 26, 2010, after filing the complaint in this action, but before he was terminated, Plaintiff filed a charge of employment discrimination based on religion with the United States Equal Employment Opportunity Commission ("EEOC"), and requested an

immediate right to sue letter. (Def. St. ¶ 150.) On February 23, 2010 the EEOC issued Plaintiff a right-to-sue letter. (Dkt. 100-4 at ECF 157.)[8]

*SUMMARY JUDGMENT STANDARD*

Summary judgment may be granted only if the submissions of the parties taken together show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986). "The moving party bears the burden of establishing the absence of any genuine issue of material fact," *Zalaski v. City of Bridgeport Police Department*, 613 F.3d 336, 340 (2d Cir. 2010); *see Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006), after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011); *see also F.D.I.C. v. Great American Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The nonmoving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotations and citations omitted); *see also*

---

[8] Defendants had argued in a previous motion to dismiss that Plaintiff's religion- and race-based Title VII claims were not properly before the Court because Plaintiff had failed to properly exhaust his administrative remedies and obtain a right-to-sue letter prior to initiating this action. (*See* Dkt. 33 at 2.) Judge Townes rejected Defendants' argument because they had only raised it in their reply in further support of their motion to dismiss. (Dkt. 38 at 5.) Although Defendants make only a passing reference to the exhaustion issue in the present summary judgment motion, the Court nonetheless addresses it *infra* at 12–14.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alterations in original); *see also Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56–57 (2d Cir. 2012); *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005). The nonmoving party cannot avoid summary judgment simply by relying "on conclusory allegations or unsubstantiated speculation," *Jeffreys*, 426 F.3d at 554 (quotations and citations omitted); *see also DeFabio v. East Hampton Union Free Sch. Dist.*, 623 F.3d 71, 81 (2d Cir. 2010); and must offer "some hard evidence showing that its version of the events is not wholly fanciful." *Miner v. Clinton Cnty.*, 541 F.3d 464, 471 (2d Cir. 2008). In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

The Second Circuit has provided additional guidance with respect to motions for summary judgment in employment discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g.*, *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact," *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997), and "may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)). "However, even in the discrimination context, a plaintiff

must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

*DISCUSSION*

I.  <u>Employment Discrimination</u>

Plaintiff alleges employment discrimination under Title VII and the NYSHRL. At the outset, Defendants argue that Plaintiff's race, retaliation, and termination claims are not justiciable by this Court because they were not raised in Plaintiff's EEOC charge. (Dkt. 102 at 3.)[9] Indeed, Plaintiff's EEOC complaint sets forth only Plaintiff's religion as a basis of the alleged discrimination. (Dkt. 100-4 at ECF 149.) Likewise, Plaintiff's charge of discrimination filed with the New York State Division of Human Rights ("NYSDHR") only sets forth religious discrimination. (Dkt. 100-4 at ECF 148.)

This Court lacks jurisdiction over employment discrimination claims which were not first alleged in an EEOC complaint, or are not reasonably related to the claims made in the charge. *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003). "A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can

_____

[9] Defendants previously argued that Plaintiff's EEOC right-to-sue letter is invalid because the EEOC issued the letter prematurely, before the 180 days required by statute. This argument is without merit. 29 C.F.R. § 1601.28(a)(2) authorizes issuance of an early notice of right to sue if it is determined that the EEOC will not complete its administrative process within 180 days from the date the charge was filed. Here, the EEOC determined that an early notice of right to sue was warranted, and issued Plaintiff's right to sue letter before the 180 days. (Dkt. 100-4 at ECF 157–8.) Moreover, even if it were invalid, an early right to sue letter is not jurisdictional in nature. *Arroyo v. WestLB Admin., Inc.*, 213 F.3d 625, at *1 (2d Cir. 2000) (summary order).

reasonably be expected to grow out of the charge that was made." *Id.* at 200–01 (citing *Fitzgerald v. Henderson*, 251 F.3d 345, 358–59 (2d Cir. 2001)). "In determining whether claims are reasonably related, the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'" *Id.* (citing *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002)); *see also Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998) ("[I]t is [the] substance of the charge and not its label that controls.").

Under this analysis, Plaintiff's claims of race and age discrimination are not reasonably related to his charge of religious discrimination. Plaintiff's EEOC charge is entitled "Complaint of Religious Discrimination." (Dkt. 100-4 at ECF 149.) Indeed, the overwhelming focus of Plaintiff's EEOC charge is his claim that he was discriminated against because he wore a beard as part of his Muslim faith. (*See* Dkt. 100-4 ¶¶ 10, 11, 14–17, 30–31.) Although Plaintiff twice states that he is an African-American in his EEOC charge (Dkt. 100-4 ¶¶ 7, 24), both of those references are in conjunction with statements regarding his status as a Muslim and in connection with his wearing of a beard as part of his religious faith. (Dkt. 100-4 at ECF 150–153.) Thus, the racial discrimination of which Plaintiff complained, namely, use of a racial epithet at the workplace that was not directed at Plaintiff, would not "reasonably be expected to grow out of the [EEOC] charge [of religious discrimination] that was made." *Deravin*, 335 F.3d at 200–01. Consequently, Plaintiff's allegations of race- and age-based discrimination are not justiciable because Plaintiff failed to exhaust his administrative remedies with respect to these claims.

However, Plaintiff's claims related to retaliation and his termination are justiciable in this action. Plaintiff was terminated after he initiated the instant lawsuit and submitted the EEOC charge. Generally, claims of both retaliation and wrongful termination postdating the submission

of an EEOC charge are excepted from the requirement that the claim must first have been made in the EEOC charge. *See Joseph v. Price Costco*, 100 Fed. App'x 857, 857–58 (2d Cir. 2004) (summary order) (citing *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402–03 (2d Cir. 1993)) ("This Circuit has recognized three situations where a plaintiff may assert in district court a claim that was not specifically pleaded in his administrative complaint because it is 'reasonably related to its EEOC claims: . . . (2) claims of retaliation for filing the EEOC charge; and (3) further incidents that occur after the filing of the EEOC charge.").

Plaintiff's claims of retaliation and termination subsequent to the filing of his EEOC charge fall under the third *Butts* exception. Defendants argue that the second *Butts* exception does not apply because Plaintiff failed to allege specific facts linking the filing of the EEOC charge and subsequent retaliation or discharge. (Dkt. 99 at 13.) That is of no moment, because of the applicability of the third *Butts* exception, which Defendants fail to address. Plaintiff's retaliation and termination claims both arise from conduct postdating the filing of the EEOC charge, and therefore fall under the third *Butts* exception. In his amended complaint, which postdates the EEOC charge, Plaintiff alleges that he was retaliated against and terminated because of the filing of the instant lawsuit. (Dkt. 8 ¶ 37.) Accordingly, Plaintiff's retaliation and wrongful termination claims are justiciable.

A.    Religious Discrimination

Plaintiff's employment discrimination claims are analyzed according to the firmly established burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp., v. Green*, 411 U.S. 792, 802 (1973). Under this framework, to defeat a motion for summary judgment the plaintiff must first establish a prima facie case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). The plaintiff's burden to establish a

prima facie case is "*de minimis*." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 114 (2d Cir. 2007). If the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises, and the burden of production shifts to the defendant to set forth a legitimate, non-discriminatory justification for its adverse employment action against the plaintiff. *Hicks*, 509 U.S. at 506–07. After the defendant comes forward with a non-discriminatory reason, the "presumption [arising from the prima facie case of discrimination], having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *Id.* at 510–11. The plaintiff then must offer evidence that the defendant's purported reason is a mere pretext for unlawful discrimination, and that the real reason for the adverse employment action was discrimination. *Weinstock*, 224 F.3d at 42. At this stage, "plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false[.]" *Id.* (citing *Van Zant v. KLM Royal Dutch* Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (internal quotations omitted)). Although the *McDonnell Douglas* framework shifts the burden of *production* between plaintiff and defendant, at all times the burden of *persuasion* rests with the plaintiff to demonstrate discrimination, *Hicks*, 509 U.S. at 518, and the ultimate issue to be determined is "discrimination *vel non*[.]" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (emphases added).

### 1. Prima Facie Case

There are four required elements to a prima facie case of employment discrimination in violation of Title VII. To establish a prima facie case, a plaintiff "must show: (1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances

giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (citing *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008)). Defendants do not dispute the first three prongs, and the Court finds no genuine issue of fact with respect to any of those elements. Accordingly, the Court addresses only the fourth element of Plaintiff's prima facie case.

i. <u>Discriminatory Intent</u>

A plaintiff may raise an inference of discriminatory intent through evidence of overt discrimination, such as discriminatory remarks or conduct. *See Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 93 (2d Cir. 2013). Plaintiff argues that he has submitted direct evidence of religious discrimination in several forms. Primarily, Plaintiff argues that Defendants' frequent requests that Plaintiff prove his Muslim status, by producing the letter stating he is a Muslim, indicates discriminatory animus. (Dkt. 105-1 at 2–3.) Defendant Carbonaro testified that it is not "the practice or policy of Wackenhut to do random spot checks to see if the people who are Muslim are carrying proof of their religious faith[.]" (Dkt. 105-9 at 74.) Carbonaro's testimony that random spot checks regarding proof of religious faith was not Wackenhut's policy, coupled with the random spot checks to which Plaintiff allegedly was subjected between June 19, 2009 and June 25, 2009, raises factual questions about why Plaintiff's supervisors requested him to produce the letter of proof, especially when the letter already was on file at Defendant Wackenhut's office. (Dkt. 105-9 at 74–75.) Plaintiff argues that the subsequent events that occurred at work, including not getting paid for one day of training, being assigned to "standing posts" without chairs, not being permitted to warm himself in a heated booth, allegedly false accusations of misconduct, and his ultimate termination, all are colored by the questions regarding Plaintiff's beard. (Dkt. 105-1 at 5.) Plaintiff claims that

"[t]he conduct of Ibraheem's superiors in pestering him about this letter evidenced a religious animus, that became blatantly apparent after the letter incident. What followed[] was a stream of harassment against Ibraheem, whereby Wackenhut tried to force him out and create a for[-]cause firing with fabricated allegations of misconduct." (Dkt. 105-1 at 5.) Viewed in the light most favorable to Plaintiff, the non-moving party, this evidence permits the reasonable inference that Plaintiff was subjected to adverse employment actions "under circumstances giving rise to an inference of discriminatory intent." *Brown*, 673 F.3d at 150.[10]

## 2. Non-Discriminatory Justification

Because Plaintiff has established a prima facie case of discrimination, the Court next considers Defendants' proffered non-discriminatory justification for Plaintiff's termination and other adverse employment actions. Defendants assert that Plaintiff was disciplined, suspended, and ultimately terminated for violating his conditions of employment by, *inter alia*, sleeping on the job and leaving his assigned duty station, which are terminable offenses according to Defendants' "disciplinary matrix." (Dkt. 99 at 15–18; Dkt. 100-3 at 131–140.) Violations of workplace policies provide ample justification for terminating Plaintiff. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 65 (2d Cir. 1997) (violation of company policy is a legitimate non-discriminatory justification for termination). Accordingly, Defendants have offered a

---

[10] This finding applies to all of the adverse employment actions alleged by Plaintiff *except* two: the standing post requirement and the failure to pay for the one day of training. Based on Plaintiff's own statements and evidence, no jury could reasonably find that these actions were motivated by any discriminatory intent toward Plaintiff or Muslims. Rather, the only evidence in the record indicates that these actions were taken uniformly as to all Wackenhut employees in Plaintiff's position.

legitimate, non-discriminatory justification for the adverse employment actions taken against Plaintiff.[11]

### 3. Pretext

Because Defendants have successfully set forth legitimate, non-discriminatory reasons for the adverse employment actions taken against Plaintiff, the rebuttable presumption of discrimination established by Plaintiff's prima facie case simply drops out of the picture, and the remaining issue on summary judgment is whether there is a genuine issue of fact as to whether Defendants' purported justification was mere pretext for discrimination, and that the real reason for the adverse employment actions was discrimination. *See James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000); *Weinstock*, 224 F.3d at 42.

The Court concludes that Plaintiff has raised a genuine issue of fact with respect to whether the adverse employment actions taken against him were motivated by a discriminatory intent based on religion. The primary evidence of Defendants' allegedly discriminatory intent is that (1) during a one-week period in June 2009, Plaintiff was asked on approximately five separate occasions by his supervisors to produce his proof-of-religion letter, even though Wackenhut policy or practice did not require employees to carry these letters with them at work (Dkt. 99 at 7; Dkt. 105-1 at 2–4);[12] and (2) approximately two months later, Plaintiff began

---

[11] Defendants, however, offer no justification for the alleged limitation placed on Plaintiff's access to the heated booth, challenging this claim instead on factual grounds. Accordingly, on this basis alone, Plaintiff's claim regarding this alleged adverse employment action survives summary judgment.

[12] At oral argument, Defendants maintained that the questioning about Plaintiff's proof-of-religion letter was at the direction of FPS, and was not initiated by Wackenhut, and that, therefore, any discriminatory intent should not be attributed to Wackenhut. That argument, however, falls short, since Wackenhut supervisors were the ones doing the questioning on all but one of the approximately five occasions. Furthermore, Wackenhut, and not FPS, was

experiencing a series of adverse events in the workplace that he had never before encountered, including being written up for violations he denies, under questionable circumstances.

In August 2009, for example, Plaintiff was accused of sleeping on the job. When he denied the accusation and demanded to see videotape evidence, Defendants neither provided it to him, nor, it appears, sought to obtain it from FPS. (Dkt. 105-9 at 18–19.) Plaintiff was nonetheless disciplined for being inattentive to duty, a serious infraction. The circumstances of the sleeping incident and Defendants' handling of it raises triable issues of fact as to the veracity of the charge and the motivation behind the disciplinary action taken against Plaintiff.

Similarly, the events immediately preceding Plaintiff's termination raise questions about the motivation behind the termination. While Plaintiff acknowledges leaving his post without permission for approximately seven minutes on April 1, 2010, he disputes the charge that he left a second time that day without permission. Instead, Plaintiff contends that he left his post the second time at the direction of his supervisor, Charles, as communicated through Plaintiff's fellow security officer, Rivera. There is a clear factual dispute as to what happened with respect to the second incident—Rivera's testimony corroborates Plaintiff's version; Charles's testimony contradicts it—and, by extension, Defendants' true reasons for firing Plaintiff that day. (Def. St. ¶¶ 123–134; Pl. St. ¶ 136; Dkt. 105-11 at 22; Dkt. 105-10 at 16–17.)

Thus, the totality of the circumstances regarding Plaintiff's alleged workplace infractions, especially the circumstances surrounding his termination, coupled with the earlier proof-of-

---

responsible for the subsequent disciplinary actions taken against Plaintiff and for his eventual termination. Thus, whether and which entities or individuals, if any, harbored a discriminatory intent is a question of fact for the jury to resolve.

religion letter incidents, raise genuine issues of material fact, to be resolved by a jury, as to whether Plaintiff suffered adverse employment actions on the basis of his religion.[13]

In sum, there remains a genuine issue of triable fact as to the reasons why Defendants persisted in requesting Plaintiff's proof of religion letter, and whether the subsequent adverse employment actions he sustained, including termination, were related to a discriminatory motive. Accordingly, Defendants' motion to dismiss Plaintiff's Title VII discrimination claim is denied.

II.    Retaliation

Plaintiff alleges that he was retaliated against for initiating this lawsuit and for filing an EEOC charge. (Dkt. 8 ¶ 37; Dkt. 105-1 at 13, 15.) "Title VII forbids any employer from 'discriminat[ing] against any of [its] employees . . . because he has made a charge, testified, assisted, or participated in any manner in a [Title VII] investigation, proceeding, or hearing.'" *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (citing 42 U.S.C. § 2000e-3(a)). Retaliation claims are analyzed according to a three-step burden-shifting analysis, *see Jute*, 420 F.3d at 173, which follows the familiar *McDonnell Douglas* framework. To withstand summary judgment, a plaintiff asserting retaliation must submit evidence sufficient to permit a jury to conclude that the defendant's retaliatory motive was a "but-for cause" of the adverse

---

[13] Plaintiff also argues that the fact that only bearded Muslim employees were required to carry proof of their religion at work demonstrates Defendants' discriminatory intent. (Dkt. 105-1 at 4.) However, this fact, on its own, does not necessarily show anti-Muslim animus. In order to make such an inference from this fact, Plaintiff would also have to show that non-Muslims who were similarly situated as Plaintiff and other bearded Muslims, *i.e.*, bearded security guards, were treated more favorably than Plaintiff and other bearded Muslims, *i.e.,* the non-Muslims were not required to produce proof of their religion as a condition for keeping their beards, or they were allowed to wear beards despite not being Muslim. Plaintiff points to no such evidence. However, it should be noted that while evidence of disparate treatment could support an inference of discriminatory intent, the absence of such evidence does not preclude Plaintiff's ability to prevail on his discrimination claim at trial. As discussed, a jury could reasonably find discriminatory intent based on the conduct directed solely at Plaintiff regarding the proof of his religion and the adverse employment actions subsequently taken against him.

employment action the plaintiff experienced. *See Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (U.S. 2013). Proof of but-for causation "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 2533.

Plaintiff has established a prima facie case of retaliation. Plaintiff alleges he was retaliated against for submitting an EEOC charge of discrimination and for filing this lawsuit. (Dkt. 105-1 at 18–26.) Plaintiff was terminated after his filing of the EEOC charge, and after filing this lawsuit, thereby permitting an inference that he was retaliated against. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010) ("Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may itself be sufficient to establish the requisite connection between a protected activity and retaliatory action."). However, for temporal proximity alone to establish a prima facie case of retaliation, the temporal connection between the protected activity and the adverse employment activity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001). Here, Plaintiff filed this lawsuit on December 7, 2009, and later submitted his EEOC charge on or about January 27, 2010. (Dkt. 1; Dkt. 100-4 at ECF 149.) Plaintiff was terminated on or about April 1, 2010, after being found away from his post on two occasions that day. (Def. St. ¶ 123.) This relatively short period of approximately two months is within the time period the Second Circuit has found sufficient to support an inference of retaliation. *See Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (permitting an inference of retaliation where the gap between the protected activity and adverse employment action was eight months); *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85–86 (2d Cir. 1990) (three-month gap).

However, where the Second Circuit has found an inference of retaliation based upon temporal proximity, there also existed other evidence to support the inference. *See, e.g.*, *Espinal v. Goord*, 558 F.3d 119, 129–30 (2d Cir. 2009) (finding evidence that a defendant's knowledge of the prior lawsuit, in conjunction with temporal proximity, supported an inference of retaliation). Here, there is other evidence to support an inference of retaliation. The circumstances surrounding the proof-of-religion letter and the subsequent infractions at work, which Plaintiff claims were pretextual, constitute additional evidence that could lead a reasonable jury to conclude that Plaintiff's termination was retaliatory. Accordingly, those facts, coupled with the timing of Plaintiff's termination, create a genuine issue of fact as to whether Plaintiff was retaliated against for filing his EEOC charge and/or initiating this lawsuit.

III.    Discrimination under the NYSHRL

Plaintiff's NYSHRL claims are analyzed pursuant to the same framework as Plaintiff's federal discrimination claims. *See Bermudez v. City of New York*, 783 F. Supp. 2d 560, 576–77 (S.D.N.Y. 2011) (citing *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010)). For the same reasons set forth above with respect to Plaintiff's federal discrimination claims, Plaintiff has raised a genuine issue of fact with respect to whether he suffered adverse employment actions on the basis of a discriminatory or retaliatory motive in violation of the NYSHRL.

IV.    Hostile Work Environment

Defendant construes Plaintiff's complaint to allege a claim for hostile work environment discrimination. (Dkt. 99 at 19–20.) Defendant moves for summary judgment on the basis that Plaintiff has failed to produce evidence sufficient to show that he experienced a hostile work place. (Dkt. 99 at 19.)

"A hostile work environment claim requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (citing *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (internal citations and quotation marks omitted)). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered." *Id.* (citing *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001)). "[A] plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of [his] working environment." *Id.* at 374 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)).

Considering the totality of the circumstances, there is a genuine issue as to whether Plaintiff experienced a hostile work environment. The facts and arguments that support Plaintiff's discrimination claim are intertwined with, and support, his hostile work environment claim. (Dkt. 105-1 at 30.) As discussed above, given the inference that could be drawn from the requests that Plaintiff produce the proof-of-religion letter, a reasonable jury could conclude that the workplace events that followed, including Plaintiff being written up for various workplace infractions, were all part of a hostile work environment based on Plaintiff's status as a Muslim. A rational jury could conclude that such a course of treatment was "'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Alfano*, 294 F.3d at 373 (citing *Perry*, 115 F.3d at 149). This is true even though Plaintiff testified that complying with the requests for the letter "wasn't difficult at all." (Def. St.

¶ 69.) It may be true that physically complying with the request that Plaintiff maintain the letter on his person while on the job was not demanding. But working in an environment in which one is asked to provide proof of their religious status to supervisors, followed by being disciplined for infractions based on a discriminatory intent, if proven, could constitute a course of conduct that materially altered the terms or conditions of Plaintiff's employment. In sum, a reasonable jury could conclude that the circumstances constituted a hostile work environment.

V.    Plaintiff's Tort Claims under the Collective Bargaining Agreement

Defendants contend that Plaintiff's tort claims are barred by the collective bargaining agreement that was in place at the time of Plaintiff's employment at Wackenhut. (Dkt. 99 at 21.) Defendants argue that the tort claims must be analyzed under the Collective Bargaining Agreement, and that they are therefore preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. (Dkt. 99 at 21.) Because the Court finds Plaintiff's tort claims to be lacking in merit, the Court declines to address preemption, and instead dismisses Plaintiff's tort claims on the merits.

A.    Intentional Infliction of Emotional Distress ("IIED")

To maintain a claim for IIED under New York law, a plaintiff must prove "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996); *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993). In New York, the tort of IIED is "extremely disfavored." *Hogan v. J.P. Morgan Chase Bank*, 05-CV-5342(JS), 2008 WL 4185875, at *4 (E.D.N.Y. Sept. 4, 2008). New York law sets a high bar for conduct that is sufficiently "extreme and outrageous" to constitute intentional infliction of emotional distress. *See Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983) (the

conduct must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community") (citations and quotation marks omitted). The question of whether the conduct alleged by a plaintiff may rise, as a matter of law, to the level of "extreme and outrageous" conduct is a question left to the district court in the first instance. *See Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (affirming dismissal of emotional distress claim, and holding that "[w]hether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance").

Generally, ordinary workplace disputes, including the discrimination, harassment, and hostile work environment claims alleged here, do not rise to the level of extreme and outrageous conduct necessary to support a claim of IIED. *See Semper v. N.Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 587 (E.D.N.Y. 2011) ("Acts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of [IIED] because the conduct alleged is not sufficiently outrageous.") (citation omitted); *see also Gerzog v. London Fog Corp.*, 907 F. Supp. 590, 604 (E.D.N.Y. 1995) (citing *Murphy*, 58 N.Y. 2d at 303) ("[New York] courts are wary of allowing plaintiffs to recharacterize their claims for wrongful or abusive discharge, both of which are not recognized in New York, as claims for intentional infliction of emotional distress."). Accordingly, federal courts in New York routinely dismiss claims of IIED in the employment context, with the only exception being where employment discrimination claims are accompanied by allegations of both sexual harassment and battery. *See Ahmed v. Compass Grp.*, 2000 WL 1072299, at *10 (S.D.N.Y. Aug. 3, 2000) (citing cases); *Semper*, 786 F. Supp. 2d at 587 (citing *Stevens v. New York*, 691 F. Supp. 2d 392, 399 (S.D.N.Y. 2009)).

Here, even viewed in the light most favorable to Plaintiff, the facts as alleged are inadequate, as a matter of law, to support a claim for intentional infliction of emotional distress. Plaintiff has only set forth facts showing that he may have been subjected to employment discrimination, harassment, or hostility, but nothing as egregious as sexual harassment or battery. Accordingly, Plaintiff's IIED claim is dismissed.

## B. Negligent Infliction of Emotional Distress

Under New York State law, a plaintiff may maintain a claim for negligent infliction of emotional stress under either of two theories—the "bystander" theory or the "direct duty" theory. Under the "bystander" theory a plaintiff may recover for "purely emotional injury" when "(1) []he is threatened with physical harm as a result of defendant's negligence; and (2) consequently []he suffers emotional injury from witnessing the death or serious bodily injury of a member of [his] immediate family." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996) (citing *Bovsun v. Sanperi*, 61 N.Y.2d 219, 230–31 (1984)). Manifestly, Plaintiff has set forth no factual basis permitting recovery under the "bystander" theory.

Under the "direct duty" theory, a plaintiff may recover "if []he suffers an emotional injury from defendant's breach of a duty which unreasonably endangered [his] own physical safety." *Id.* (citing *Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 504 (1983)). "The duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Id.* (citing *Johnson v. Jamaica Hosp.*, 62 N.Y.2d 523, 526–27 (1984)).

Plaintiff has set forth no evidence, nor made any allegations, satisfying these requirements. Accordingly, Plaintiff's claim of negligent infliction of emotional distress is dismissed.

C. Defamation

Plaintiff alleges that he was defamed when it was reported that he was asleep on the job. Plaintiff's amended complaint alleges that Alvarez and Sandrowsky (who no longer are defendants in this action) defamed him when they reported to Carbonaro[14] that Plaintiff was asleep while on duty. (Dkt. 8 at 53.) In turn, in relying on the statements made by the FPS officers, Carbonaro prepared a disciplinary report in which he recommended dismissal based on the report that Plaintiff was "sitting in a chair asleep on post," which was then presented to Isom. (Def. St. ¶ 81–82; Dkt. 100-2 at 133; Dkt. 105-6 at 199, 202.)

"To state a claim for defamation under New York Law, the plaintiff must allege (1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010) (citing *Gargiulo v. Forster & Garbus, Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009) (itself citing *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (1st Dep't 1999)). A defamatory statement is one that exposes an individual "'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induces an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society.'" *Karedes v. Ackerley Grp.*,

---

[14] Carbonaro submitted a declaration in this action testifying that Alvarez and Sandrowsky reported to him that Plaintiff was asleep. (*See* Dkt. 100-7 at 2.) However, Plaintiff's deposition testimony suggests that Plaintiff believes Velati prepared the formal report regarding Plaintiff sleeping on the job. Although the Court accepts as true that Carbonaro received the report from Alvarez and Sandrowsky, it is irrelevant, for purposes of this motion, who received the report, because Plaintiff's claim is without merit in either scenario.

*Inc.*, 423 F.3d 107, 113 (2d Cir. 2005) (quoting *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 177 (2d Cir. 2000)).

First, the individuals who allegedly made the initial allegedly defamatory statements—Alvarez and Sandrowsky—are no longer defendants to this action. Second, insofar as Velati or Carbonaro could be held liable for passing along what was reported to them by Alvarez and Sandrowsky, they are protected by the so-called common interest privilege that applies to defamation claims in New York. *See Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 146 (2d Cir. 2001). Irrespective of the truth of the statements Plaintiff alleges were defamatory, *viz.* that he was sleeping on the job, they are covered by the qualified privilege that extends to statements made to people with a "common interest in the subject matter." *See Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011) (citing *Liberman v. Gelstein*, 80 N.Y.2d 429, 437 (1992)) (a "qualified[] privilege extends to a communication made by one person to another upon a subject in which both have an interest.") The so-called common interest privilege applies to "[e]valuations of employees made by their superiors." *Shamley v. ITT Corp.*, 869 F.2d 167, 173 (2d Cir. 1989) (citing *Mock v. LaGuardia Hosp.-Hip Hosp., Inc.*, 117 A.D.2d 721 (2d Dep't 1986)); *see also Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2010) ("Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the [common interest] privilege"); *see also McNaughton v. City of New York*, 234 A.D.2d 83, 84 (1st Dep't 1996) (holding that statements made "in disciplinary memoranda evaluating plaintiff's performance" are "protected by qualified privilege").

"The [common interest] privilege creates a rebuttable presumption of good faith that constitutes a complete defense to defamation." *Hussey v. N.Y. State Dep't of Law/Office of Atty. Gen.*, 933 F. Supp. 2d 399, 414 (E.D.N.Y. 2013) (citing *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 62 (2d Cir. 1993)). That privilege only may be rebutted by evidence of "malice on the part of their superiors." *Shamley*, 869 F.2d at 173. As a result of the privilege, even if the statements regarding Plaintiff sleeping on the job were false and therefore potentially defamatory (Dkt. 99 at 24; Def. St. ¶¶ 81–82, 159), Defendants would still be entitled to a qualified privilege in the absence of evidence of malice.

Plaintiff has submitted no evidence creating a genuine issue of fact regarding whether Carbonaro acted with malice when he documented that Alvarez and Sandrowsky reported to him that Plaintiff was asleep at work. To show actual malice, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action." *Chandok*, 632 F.3d at 815. Plaintiff has submitted no evidence supporting a finding that Carbonaro, Velati, or Isom knew or was highly aware that it was probably false that Plaintiff was asleep on the job, or intentionally fabricated that he was asleep. *Chandok*, 632 F.3d at 815 (citing *Liberman*, 80 N.Y.2d at 438). Accordingly, the statements of Alvarez and Sandrowsky, as recorded by Carbonaro, fall within the common interest privilege.

Moreover, truth is an absolute defense to defamation. *See Ciuffetelli v. Apple Bank for Sav.*, 2000 WL 340388, at *3 (2d Cir. Mar. 30, 2011). The allegedly defamatory statement made by Carbonaro is that he was *told* by "FPOs Jose Alvarez and Gary Sandrowsky . . . [that they had] observed [Ibraheem] sitting on a chair and asleep on post for approximately two minutes." (Dkt. 100-2 at 132; *see also* Dkt. 100-8 at 5.) Plaintiff has set forth no facts to establish that

Carbonaro acted with malice or reckless disregard with respect to documenting the report of the two FPOs or that Carbonaro fabricated that Alvarez and Sandrowsky so reported to him.

Accordingly, Plaintiff's defamation claim is dismissed.

D.  Breach of Contract

Plaintiff withdraws his claim for breach of contract and it accordingly is dismissed.

*CONCLUSION*

For the reasons and to the extent set forth above, Defendants' motion for summary judgment is granted in part and denied in part.  Plaintiff's employment discrimination and hostile work environment claims based on religion, and his retaliation claims, are not dismissed. Plaintiff's discrimination claim based on race and age, and his state law claims for intentional and negligent infliction of emotional distress and for defamation, are dismissed with prejudice.

SO ORDERED:


    ___/s/ Pamela K. Chen_____
PAMELA K. CHEN
United States District Judge

Dated: May 9, 2014
          Brooklyn, New York